CHICAGO & N. W. RY. CO. *v.* DEY *et al.*, Railway Commissioners.

(*Circuit Court, S. D. Iowa.* July 27, 1888.)

1. COURTS—FEDERAL COURTS—SUITS AGAINST STATES.
    A suit by a railroad company chartered in one state, in a federal court, to restrain railroad commissioners of another state from putting in force a schedule of rates, is not a suit against a state, within the meaning of the eleventh amendment to the constitution of the United States, providing that the judicial power of the United States shall not extend to suits against one of the states by citizens of another state.

2. RAILROAD COMPANIES — REGULATION OF CHARGES — CONSTITUTIONAL LAW — DELEGATION OF LEGISLATIVE POWERS.
    The provisions of the act of the Iowa legislature of April 5, 1888, to regulate railroad corporations and other common carriers, and to increase the powers, and further define the duties, of the state board of railroad commissioners, and to prevent and punish extortion and unjust discriminations, which authorize said board to make and enforce a schedule of rates for railroad charges, are not unconstitutional as an attempted delegation of legislative power.

3. SAME—EQUITY—JURISDICTION—INJUNCTION.
    Equity will restrain the enforcement of a schedule of rates for railroad charges, fixed by legislative authority, when the rate prescribed will not pay the cost of necessary skilled service, the cost of the best appliances and keeping the same in proper condition, interest on bonds, and then leave something for dividends.

4. SAME—UNREASONABLE RATE—FOREIGN CORPORATIONS.
    It is no defense to a proceeding to restrain the enforcement of an unreasonable rate, that the plaintiff is a foreign corporation, doing business in the state only as a matter of grace and may retire when the business ceases to be profitable; or that it operates through other states, where no rates are fixed, which will enable it to make profit.

5. SAME—SPECULATIVE PROFITS.
    Nor is it any defense that the reduced rates may increase the volume of business, and make it more remunerative than at present, as the court must determine rights upon existing facts.

6. SAME—INJUNCTION—CONTINUING PRELIMINARY.

Where the evidence shows that the probable effect of putting in force the schedule of rates as prepared by the commissioners would be to destroy all dividends from the operation of the roads, and the law provides for treble damages to any shipper who may be injured by an overcharge, the preliminary injunction should be continued until final hearing.

7. SAME—WRONGS PREVENTED—MULTIPLICITY OF SUITS.

That the commissioners have advertised in the state papers that a schedule as prepared by them will be put in force on a day named is sufficient to give equity jurisdiction, on the application of a railroad, before the expiration of the time, to restrain the enforcement of such schedule, on the ground of preventing a multiplicity of suits.

8. SAME—STATE BOARDS—ACTS—ESTOPPEL.

Where the commissioners have published the notice that the schedule would go into effect on a certain day, for the length of time required by law, but, on receipt of a telegram from certain railroads asking an extension of time, the secretary of the commission grants an extension, and publishes notice of such change the following week, the commission, on the application of such railroads to restrain the further publication of such notice, cannot urge that the publication is complete, and that the extension of time was unauthorized.

In Equity. On motion for preliminary injunction.

Under the provisions of chapter 28, Laws 22d Gen. Assem. Iowa, the defendants, as railroad commissioners of said state, on the 14th day of June last, made a schedule of reasonable maximum rates of charges for the transportation of freight and cars on the railroads in the state of Iowa, and also made a classification of freight to accompany and be a part of the schedule of rates so made. Acting under the provisions of section 17, they caused notice to be published in the Daily News, and in the Iowa Capital, daily newspapers published in the city of Des Moines, for eight consecutive days, beginning on the 14th day of June, when the first insertion was put in the paper, and ending on the 21st day of June, the date of the last insertion. On the 22d of June, one of the railroad commissioners, at the request of some of the general officers of the railroads, caused the notice to be changed, and thereafter published, designating the 5th day of July as the time when said rates would take effect, instead of the 28th day of June, as fixed by the board of railroad commissioners, and as first published by its order. The bill for injunction recites the material provisions of chapter 28, Laws 22d Gen. Assem., authorizing and directing the railroad commissioners to make the schedule. It is charged in the bill that the law is unconstitutional, in that—*First*, it seeks to deprive the complainant of its property without due process of law; *second*, the power to fix rates for common carriers is a legislative function, and cannot be delegated to commissioners; *third*, the provision making the schedule of rates *prima facie* evidence that the rates so fixed are reasonable, is unconstitutional, and deprives the complainant of the right of trial by jury; *fourth*, the provisions of the law defining what acts shall constitute extortion are so indefinite and uncertain as to render the law void. It is further charged that the rates as fixed are not reasonable rates, but that they are unjust and unreasonable, and so low as that, if enforced, the complainant will not be able to earn sufficient to pay its operating expenses, fixed charges, and have a surplus left to pay dividends on stock; and that the result will be to render many, if not all, the

railroads of Iowa insolvent. The prayer of the bill is that the railroad commissioners be enjoined and restrained from further publishing notice of said schedule, and also that they be enjoined from instituting or prosecuting any suits for penalties provided in said act, from entering complaint, or making orders thereon, and instituting or causing to be instituted any suits to enforce such orders having for their object the enforcement of said schedule, and asking for a temporary injunction restraining the defendants from continuing the publication of said notice, and from instituting and prosecuting suits during the pendency of this suit. Upon presentation of said bill to Judge BREWER, in chambers, a restraining order was issued, and the case was set for hearing on the motion for temporary injunction before the judge at chambers, in Leavenworth, Kan., on July 5, 1888. No pleadings were filed at such hearing by the defendants further than a written protest against the jurisdiction of the court to hear and determine the controversy in question, for the reason that, while the suit was nominally against railroad commissioners, it was in fact a suit against the state, and fell within the prohibition of the eleventh amendment of the constitution of the United States.

*W. C. Goudy*, for complainant.

*A. J. Baker*, Atty. Gen., and *C. C. Nourse*, for respondents.

It is competent for the state legislature to fix the rates and classifications which may be charged by common carriers of any kind in the transportation either of freight or passengers from point to point within the state. *Munn v. Illinois*, 94 U. S. 113; *Railroad Co. v. Iowa*, Id. 155; *Peik v. Railroad Co.*, Id. 164; *Stone v. Trust Co.*, 116 U. S. 307, 6 Sup. Ct. Rep. 334; *Railroad Co. v. People*, 77 Ill. 443; *Tilley v Railroad Co.*, 5 Fed. Rep. 641; *Railroad Co. v. Commissioners*, 70 Ga. 694. This power may be delegated to commissioners. *Munn v. Illinois, supra; State v Railroad Co.*, 36 N. W. Rep. 308, 35 N. W. Rep. 118; *Stone v. Trust Co., supra; State v. Railway Co.*, 37 N. W. Rep. 782; *Railroad Co. v. Commissioners*, 70 Ga. 694; *Railroad Co. v. People, supra; Tilley v. Railroad Co., supra; State v. Railroad Co.*, 35 N. W. Rep. 125. When the rates have been thus established by the commissioners, the courts cannot interfere therewith, nor can the court limit the board in fixing such rates. *Tilley v. Railroad Co., supra; State v. Railway Co., supra.* General laws fixing maximum rates do not deprive the corporation of its property without due process of law. The question as to the inadequacy of the rate is not one to be considered on the hearing of the motion for preliminary injunction. If the rates be unreasonable, there is an adequate remedy, either by a change of rates by the commission, or it may show that fact in any suit which may be brought against it under the law.

This is an action against the state, and not against the defendants named in the petition. *In re Ayers*, 123 U. S. 443, 8 Sup. Ct. Rep. 164. Where it is manifest on the face of the record that the defendants have no individual interest in the controversy, and the relief sought against them is only in their official capacity as representatives of the state, which alone is to be affected by the decree, the question whether the suit is not substantially one against the state is one of jurisdiction. See, also, *Hagood v. Southern*, 117 U. S. 52, 6 Sup. Ct. Rep. 608; *Louisiana v. Jumel*, 107 U. S. 711, 2 Sup. Ct. Rep. 128; *New Hampshire v. Louisiana*, 108 U. S. 76, 2 Sup. Ct. Rep. 176. The state cannot be restrained from enforcing its penal and criminal statutes. *In re Sawyer*, 124 U. S. 210, 211, 219, 8 Sup. Ct. Rep. 482.

BREWER, J.   This is a bill filed by the complainant, a railroad corporation, organized under the laws of the state of Illinois, against Peter A. Dey and others, they being the railroad commissioners of the state of Iowa, and seeks to enjoin them from putting in force a certain schedule of rates prepared by them for all transportation within the limits of the state.   The matter is now submitted on an application for a preliminary injunction.   The defendants have filed a protest, something in the nature of a plea to the jurisdiction, in which they represent that they have no personal interest in the matter; that all they have done or intend to do is as officers of the state, and that the only real party in interest is the state; and therefore urge that this court has no jurisdiction. No one can be insensible to the importance of this as well as the other questions in the case.   On the one hand are vast properties invested in the legitimate business of railroad transportation, insisting that their rights are threatened with irreparable injury, and that this court alone can afford them adequate protection.   On the other hand are defendants, claiming to represent the sovereign state of Iowa, insisting that she should be permitted to enforce her own laws upon property within her jurisdiction, free from any judicial interference.   Not only are the interests at stake large, but, beyond that, the questions discussed are many of them of exceeding difficulty, and the paths to be trod in their examination ones upon which the lamps of precedent have as yet thrown but a feeble and glimmering light.

Of course, as jurisdiction is challenged, it presents the first matter of inquiry.   The objection is that the state is really, though not nominally, the defendant, and that, under the eleventh amendment, federal courts cannot take jurisdiction of suits by individuals against states.   The records of the supreme court disclose many cases in which this defense has been presented, and to those cases we turn for light upon the question. The early rule of that court was laid down by Chief Justice MARSHALL, in the case of *Osborn* v. *Bank*, 9 Wheat. 738, in which he said:

"It may, we think, be laid down as the rule, which admits of no exception, that in all cases where jurisdiction depends upon party, it is the party named in the record; consequently the eleventh amendment, which restrains the jurisdiction granted by the constitution over suits against states, is of necessity limited to those suits in which the state is the party on the record."

Similar language is found in *Davis* v. *Gray*, 16 Wall. 203.   But recent cases set aside that rule, and establish a more reasonable one,—that that amendment covers not only suits brought against the state by name, but those against its officers, agents, and representatives, where the state, though not named as defendant, is the real party against which relief is asked, and the judgment will operate.   *In re Ayers*, 123 U. S. 443, 8 Sup. Ct. Rep. 164.   In this case the matter is discussed at length, and previous decisions examined and explained.   The state is not here a nominal party.   Is it the real party against which relief is asked, and upon which the judgment will operate?   And here must be noticed the manifest distinction which exists between the state and the citizens of the state.   A judgment may affect and operate upon one or more citizens with-

out affecting or operating upon the state in any such direct manner as to make it the real party in interest. It must also be noticed that sometimes the relations of the state to its citizens and others is a purely business relation, while again it is entirely governmental. The state enters into contracts as an individual, both in respect to real and personal property. It issues bonds or other promises to pay, and in these respects the state as a corporate entity contracts as an individual; and when litigation arises in which such contracts are involved directly or indirectly, then this corporate entity, the state, is the real party against which the relief is asked, and the judgment operates. And in all the cases in which, where the state was not a party to the record, and yet the judgment of the supreme court was that it was a real party in interest, and therefore the federal court without jurisdiction, it will, I think, be found that some contract of the state was the foundation of the litigation; and that those suits, though nominally against state officers, were construed by that court as in fact suits to compel performance by the state of its contract, or to prevent it from carrying into effect measures intended to work a repudiation. Besides the case *In re Ayers, supra,* may be noticed as leading cases in this line of decision: *Louisiana* v. *Jumel,* 107 U. S. 711, 2 Sup. Ct. Rep. 128; *Antoni* v. *Greenhow,* 107 U. S. 769, 2 Sup. Ct. Rep. 91; *Hagood* v. *Southern,* 117 U. S. 52, 6 Sup. Ct. Rep. 608. On the other hand, the state in its governmental relation to its citizens and others within its jurisdiction enacts laws designed to regulate the dealings of one individual with another, or between corporations and individuals. In these matters, although in a certain sense the state is interested, as it is in all matters affecting the welfare and happiness of the people, yet it is interested only in a general sense, and not in that direct pecuniary sense which makes it, in the language of the law, the real party in interest,—the one to be affected by litigation in which the constitutionality of such enactments is challenged. It is not the party against whom relief is asked, or upon whom the judgment operates. The judgment may operate upon or affect few or many of its citizens, and still the state, as a state, is not the party interested. For instance, the state passes a law in respect to the rate of interest. Such a law may affect the welfare of many citizens, and in a general and remote sense the state is interested in seeing that law enforced; but will it be contended that a suit between individuals, even though one of those individuals be a state officer, in which the constitutionalty of such a law is challenged, and rights insisted upon as against its validity, is one in which the state is the real party in interest,—the one against which relief is asked, and upon which the judgment will operate. If this be true in the lesser case of interest, is it not equally true in the larger matter of railroad rates? Whether the shipper shall pay to the railroad, and the railroad exact from the shipper, 10 cents a hundred or 50 cents a hundred for the carriage of goods, is not a matter in which the state, as a state, is interested other than in the general sense heretofore mentioned. No contract of the state is involved in litigation; no judgment can be rendered which affects it as a corporate entity; and it is affected and interested only as it is interested and

affected by the welfare of its citizens. The legislation which is involved in this inquiry is governmental in its nature; not contractual. No obligation that the state has entered into, no contract or promise that it has made, is challenged. There is no attempt to compel performance of a contract, or prevent repudiation by the state. The real parties in interest are the shippers and the carriers; and the judgment operates in reality upon these parties alone. Suppose the city council of a city should, as it frequently does, prescribe rates for drayage or hack hire, would it be seriously contended that a suit by a hackman against a passenger to collect his fare, in which the validity of the ordinance was challenged, was one in which the city was the real party against which relief was asked, and upon which judgment would operate? Wherein is the difference, save in magnitude, between that case and this. The fact that these defendants, being merely officers, have no interest, is no criterion. Seldom does an officer have any personal interest, and yet the records of the supreme court are full of cases in which suits have been maintained against state officers. Oftentimes, when the unconstitutionality of a statute is alleged, the only way in which relief can be obtained is by suit against the officers to stay their proceedings under the law.

It is useless to cite the authorities; they are carefully collected, and may be found in the briefs of counsel, and the opinion of the court in *Re Ayers, supra.* The defendants claim that they are simply attempting to carry into effect the mandates of the state, as expressed in one of its laws; but if that law be unconstitutional, it is no law, and they have no authority for their actions. This proceeding is a judicial inquiry to see whether they have authority for their actions; whether the law upon which they rely is valid and constitutional, or sufficient to justify the actions which they are taking. In the case of *Poindexter* v. *Greenhow,* 114 U. S. 290, 5 Sup. Ct. Rep. 903, 962, the court draws a very important distinction between the state and the government of the state, and shows how an unconstitutional statute is not an act of the state, and affords no justification for acts done or attempted to be done under it. The discussion of this matter is too long for quotation, but it is forcible and suggestive, and to be commended to the consideration of every thoughtful student of the value of written constitutions in securing protection to person and property. Beyond these general considerations all the adjudications of the federal courts in suits against railroad commissioners make against the defense of the want of jurisdiction. In *Piek* v. *Railway Co.,* 6 Biss. 177, jurisdiction was sustained by the circuit court in a suit similar to this, and perpetual injunction granted against the railroad commissioners of the state of Wisconsin. A similar ruling was made in the circuit court of Tennessee, in the case of *Railroad Co.* v. *Commissioners,* 19 Fed. Rep. 679. Also in the circuit court of Mississippi, in the case of *Trust Co.* v. *Stone,* 20 Fed. Rep. 270. The first and last of these cases were taken to the supreme court of the United States, and, while the judgments of the circuit courts were reversed, it was not on the ground of a lack of jurisdiction; nothing, indeed, was said by that court

as to the question of jurisdiction, but it was assumed to exist, and the judgments were on the merits. See 94 U. S. 164; 116 U. S. 307, 6 Sup. Ct. Rep. 334. Other cases also appear in the supreme court reports in which that court took jurisdiction of cases against officers exercising similar functions.

Neither is there, in sustaining the jurisdiction of this court, any invasion of the powers of the legislature. Whether the preparation of the schedule was the exercise of legislative power or not is a question for further consideration; but, so far as the legislature itself is concerned, its action was complete before this suit was commenced. The law had been passed with all the proper forms of legislative proceedings, and had been duly published, and the legislature had adjourned. So far as the legislature is concerned, its action was finished, and nothing is here sought in the way of interference with its proceedings or its action. The only question is whether that which it has done—and it has done all that it can do—is valid or invalid in the face of constitutional provisions. Neither is it any interference with the executive in the discharge of his duties. Defendants cite the case of *Mississippi* v. *Johnson*, 4 Wall. 475, in which the supreme court held that the president could not be restrained by injunction from carrying into effect an act of congress alleged to be unconstitutional. Giving full scope to the doctrines of that case, it in no manner conflicts with the right to maintain this suit. That case was limited narrowly to the president,—the general executive, —and it was nowhere intimated in the opinion that subordinate officers of the United States could not be restrained from acts trespassing upon private rights. In that case there was no question of property rights; a mere question in respect to some act of political administration. Here no matter of political administration is challenged, and the bill is rested upon the proposition that the property rights of the complainant are invaded by the threatened action of the defendants, under, as alleged, an unconstitutional law, or beyond the constitutional limits of power. This is all that I think I need say on the question of jurisdiction. I am aware that some expressions here and there to be found in the opinions of the supreme court, taken apart from the case in which they were uttered, make against the jurisdiction of this court in the present case. Indeed, the question of jurisdiction is a doubtful one; but the fact that it is doubtful is no ground for refusing to entertain jurisdiction. I can close this branch of the case in no better way than by quoting the language of Chief Justice MARSHALL, in the case of *Cohens* v. *Virginia*, 6 Wheat. 264:

"The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given; the one or the other would be treason to the constitution."

I commend these words of America's greatest judge to the thoughtful consideration of those who, realizing that the primary duty of the courts

is the protection of the rights of persons and property; nevertheless sometimes hastily denounce their, as supposed, at least, unwarranted interference.

Coming now to the questions other than those of jurisdiction, on April 5th of this year the legislature of this state enacted a law to regulate railway corporations and other common carriers, and to increase the powers and further define the duties of the board of railroad commissioners in respect to the same, and to prevent and punish extortion and unjust discrimination, etc. Section 2 declares that all charges made for transportation shall be reasonable and just, "and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful." By section 17 the railroad commissioners are required to make a schedule of reasonable and maximum rates, and such schedule is declared to be *prima facie* evidence that the rates therein charged are reasonable and just maximum rates and charges for transportation, etc., in all suits brought against the railroad corporations. Section 23 provides that, "if any railroad corporation or common carrier subject to the provisions of this act shall charge, collect, demand, or receive more than a fair and reasonable rate of toll or compensation for the transportation of passengers or freight of any description, or for the use or transportation of any railroad car upon its track, or any of the branches thereof, or upon any railroad within the state, which it has a right, license, or permission to use, operate, or control, or shall make any unjust or unreasonable charge prohibited in section 2 of this act, the same shall be deemed guilty of extortion, and shall be dealt with as is hereinafter provided; and if any such railroad corporation or common carrier shall be found guilty of any unjust discrimination, as defined in section 3 of this act, upon conviction thereof it shall be dealt with as hereinafter provided." Section 26 makes the penalty a fine of not less than one thousand nor more than five thousand dollars for the first offense, and for each subsequent offense not less than five nor more than ten thousand dollars. By section 9, any person injured by any act of the railroad company in violation of this law is allowed to recover treble damages and a reasonable counsel fee. Now, the first proposition of counsel for complainant is that the provisions of this law, authorizing the railroad commissioners to make and put in effect a schedule of rates, are unconstitutional, because of an attempted delegation of legislative power. Their argument is brief and clear. It is that the power of fixing rates is purely legislative, and, in support of that, several decisions of the supreme court are cited, particularly in what are known as the *Granger Cases*, 94 U. S. 113–187 Thus, in *Chicago* v. *Iowa*, Id. 161, the court says: "Railroad companies are subject to legislative control as to their rates of fare and freight." In the case of *Peik* v. *Railway Co.*, 94 U. S. 178, it is said: "Where property has been clothed with public interest, the legislature may fix the limit to that which in law shall be reasonable for its use." And in the *Munn Case*, 94 U. S. 113, the court says: "In countries where the common law prevails, it has been customary from time immemorial for the legislature to say what shall be a reasonable compensation

under special circumstances." The constitution of the state of Iowa, as those in other states, divides the government into three departments, the legislative, the executive, and the judicial; and in article 3, § 1, declares that "no person, charged with the exercise of powers properly belonging to one, shall exercise any functions appertaining to either of the others." By another section the legislative power is vested in a general assembly, consisting of two bodies,—the senate and the house. No provisions exist in the constitution for a railroad commission. Hence counsel conclude that the legislature is the only body which can fix rates, and that it may not abdicate its functions and delegate this legislative power to another body. Of course, this question is pivotal; for if the legislature alone can fix rates, the railroad commissioners are exercising functions which do not belong to them; and if the rates proposed infringe upon the property rights of the complainant, it may insist that such unauthorized action of the commissioners be stayed. It is not always easy to answer an argument so simple and clear, where each of the propositions is, in a general sense, at least, confessedly true. I concede the force of the argument, and yet I do not think I should be warranted in sustaining the claim, and for these reasons: *First.* It is elemental that a law will not be declared unconstitutional unless its vice is obvious. As said by Chief Justice WAITE in the *Munn Case, supra:* "Every statute is presumed to be constitutional. The court ought not to declare one unconstitutional unless it is clearly so. If there is doubt, the expressed will of the legislature should be sustained." Or, as has been elsewhere epigrammatically said, "A doubt sustains the law." *Second.* There is no inherent vice in such a delegation of power; nothing in the nature of things which would prevent the state, by constitutional enactment at least, from intrusting these powers to such a board; and nothing in such constitutional action which would invade any rights guarantied by the federal constitution. So that, after all, the question is one more of form than of substance. The vital question with both shipper and carrier is that the rates shall be just and reasonable, and not by what body they shall be put in force. *Third.* While, in a general sense, following the language of the supreme court, it must be conceded that the power to fix rates is legislative, yet the line of demarkation between legislative and administrative functions is not always easily discerned. The one runs into the other. The law books are full of statutes unquestionably valid, in which the legislature has been content to simply establish rules and principles, leaving execution and details to other officers. Here it has declared that rates shall be reasonable and just, and committed what is, partially at least, the mere administration of that law to the railroad commissioners. Suppose, instead of a general declaration that rates should be reasonable and just, it had ordered that the rates should be so fixed as to secure to the carrier above the cost of carriage 3 per cent. upon the money invested in the means of transportation, and then committed to the board of railroad commissioners the fixing of a schedule to carry this rule into effect, would not the functions thus vested in such a board be strictly administrative? While, of course, the cases are

not exactly parallel, yet the illustration suggests how closely administrative functions press upon legislative power, and enforce the conviction that that which partakes so largely of mere administration should not hastily be declared an unconstitutional delegation of legislative power. *Fourth.* The reasonableness of a rate changes with the changed condition of circumstances. That which would be fair and reasonable to-day, six months or a year hence may be either too high or too low. The legislature convenes only at stated periods; in this state once in two years. Justice will be more likely done if this power of fixing rates is vested in a body of continual session than if left with one meeting only at stated and long intervals. Such a power can change rates at any time, and thus meet the changing conditions of circumstances. While, of course, the argument from inconvenience cannot be pushed too far, yet it is certainly a matter of inquiry whether in the increasing complexity of our civilization, our social and business relations, the power of the legislature to give increased extent to administrative functions must not be recognized. *Fifth.* The decisions of the supreme court of the state as to whether such a delegation of power conflicts with the state constitution must be accepted in the federal courts as final. And a federal court should not hurry to declare that unconstitutional which the state court may subsequently hold to be valid; especially when the supreme courts of some sister states have already upheld similar enactments. Finally, whatever of direct authority upon the question exists, sustains this delegation of power.

In the recent case *State* v. *Railroad Co.*, 37 N. W. Rep. 782, the supreme court of Minnesota considered this question, and sustained a similar enactment. See, also, the case of *State* v. *Railroad Co.*, 35 N. W. Rep. 118, and 36 N. W. Rep. 308, (decided by the supreme court of Nebraska.) In the case of *Tilley* v. *Railroad Co.*, 5 Fed. Rep. 641, Mr. Justice Woons of the supreme court of the United States, sitting on the circuit, also considered the question in a carefully prepared opinion, and sustained a similar enactment. See, also, other cases cited in the opinion of the supreme court of Minnesota, *supra.* Beyond that, in the case of *Stone* v. *Trust Co.*, 116 U. S. 307, 6 Sup. Ct. Rep. 334, the validity of the act of the state of Mississippi, delegating like power to a board of railroad commissioners, was before the supreme court of the United States, and, though this specific objection was made by counsel to its validity, the act was sustained. True, no special reference was made to this question in the opinion, and it was intimated that there might be questions arising under portions of the act thereafter to be determined, so that possibly that case cannot be taken as an authoritative determination by that court of this question; still, as I said, all the authorities that have been cited, or that I have been able to find, bearing upon this precise question, are in favor of the constitutionality of such a delegation of power. For these reasons I conclude that this contention of the complainant cannot be sustained.

The next proposition of complainant is that the law is a penal one; that it imposes enormous penalties without clearly defining the offenses.

It will be observed that section 2 requires that all charges shall be reasonable and just. Section 23 provides that if any railroad company shall charge more than a fair and reasonable rate of toll, or make any unjust charge prohibited in section 2, it shall be deemed guilty of extortion, and, by section 26, be subject to criminal prosecution, with a large penalty. Now the contention of complainant is that the substance of these provisions is, that, if a railroad company charges an unreasonable rate, it shall be deemed a criminal, and punished by fine, and that such a statute is too indefinite and uncertain, no man being able to tell in advance what in fact is, or what any jury will find to be, a reasonable charge. If this were the construction to be placed upon this act as a whole, it would certainly be obnoxious to complainant's criticism, for no penal law can be sustained unless its mandates are so clearly expressed that any ordinary person can determine in advance what he may and what he may not do under it. In Dwar. St. 652, it is laid down "that it is impossible to dissent from the doctrine of Lord Coke, that acts of parliament ought to be plainly and clearly, and not cunningly and darkly, penned, especially in legal matters." See, also, *U. S.* v. *Sharp*, Pet. C. C. 122; *The Enterprise*, 1 Paine, 34; Bish. St. Cr. § 41; Lieb. Herm. 156. In this the author quotes the law of the Chinese Penal Code, which reads as follows:

"Whoever is guilty of improper conduct, and of such as is contrary to the spirit of the laws, though not a breach of any specific part of it, shall be punished at least forty blows; and when the impropriety is of a serious nature, with eighty blows."

There is very little difference between such a statute and one which would make it a criminal offense to charge more than a reasonable rate. See another illustration in *Ex parte Jackson*, 45 Ark. 158. On the other hand, it is contended by defendants that the law, taken as a whole, makes the commissioners' schedule the test, and that the state is estopped to say that any charge equal to or less than that prescribed in the schedule was unreasonable. With such a construction there is definiteness and certainty, and the other provisions are a mere act of favor to the railroad companies, enabling them, in case a charge above the schedule rate is made, to show that such higher charge was in fact reasonable, and therefore the party guilty of no crime. *Railroad Co.* v. *People*, 77 Ill. 443; *Sorrell* v. *Railroad Co.*, 75 Ga. 509. Another proposition of complainant is that the provisions making the schedule *prima facie* evidence in all suits is an infringement of the right to trial by jury guarantied by the constitution of Iowa, and those provisions of the Iowa and federal constitutions to the effect that no person shall be deprived of property without due process of law; the argument being that in trials by jury all questions of fact are to be determined by a jury, and should not be prejudged by the action of any other board or officer; that the state should be compelled to prove that the charge was unreasonable, and not compel the defendant, after this *prima facie* evidence, made by strangers to the litigation, and not from examination of the facts in the particular case, had been received, to prove that the charge was reasonable. **In**

support of this contention the cases of *Plimpton* v. *Somerset*, 33 Vt. 283; *Francis* v. *Baker*, 11 R. I. 103; *State* v. *Beswick*, 13 R. I. 213,—are cited. On the other hand, it is contended by the defendants that the legislature has power to change the rules of evidence, and that that is all that is done by this provision, and that, even in the absence of such express language in the statute, the fact that the schedule had been established by competent authority as a schedule of reasonable maximum rates would make it *prima facie*, if not conclusive, evidence. Another proposition of complainant is that the penalties are so excessive that the act cannot be sustained,—one thousand to five thousand dollars for the first offense; five to ten thousand for each subsequent offense,—and the statement is made that a single day's business, if the charge for each shipment should turn out to be, in the judgment of the jury, an unreasonable charge, would accumulate penalties from a half a million to two and one-half millions. On the other hand, it is insisted by the defendants that obedience to the law brings no penalty; that the wealth and power of these large railway corporations justify large penalties; and that any way it would be an anomaly for a court of equity to restrain the operation of a penal law in behalf of one purposing to violate it, on the mere ground that the punishment for such violation is excessive. These three questions were argued at length by counsel, but, in the view which I have taken of the case, I deem it unnecessary, at least on this application for a preliminary injunction, to decide either. I shall assume, for the purposes of this motion, that the complainant's construction is wrong, or, if right, that it furnishes no basis for the exercise of the restraining power of injunction; and with these comments pass to the third principal question.

Complainant claims that the schedule of rates prescribed is unreasonable. Defendants insist that the courts may not inquire whether it be reasonable or not; that the power of the state is absolute, and without limit; that when it is once determined that the state has acted in accordance with the form of law, all inquiry in the courts is at an end. Reliance is placed by them upon the decisions of the supreme court in the so-called *Granger Cases*, 94 U. S. 113–187. It is not open to question that some expressions in the opinions fully sustain their contention. Thus, in the first case, (*Munn Case*,) Chief Justice WAITE, after holding that the power of fixing the rates is vested in the legislature, uses this language:

"We know that this is a power which may be abused, but that is no argument against its existence; for protection against abuses by legislatures the people must resort to the polls, and not to the courts."

In the next case he uses this language:

"It was within the power of the company to call upon the legislature to fix permanently this limit, and make it a part of the charter, and, if it was refused, to abstain from building the road and establishing the contemplated business. If that had been done, the charter might have presented a contract against future legislative interference, but it was not, and the company invested its capital relying upon the good faith of the people and the wisdom

and impartiality of legislators for protection against wrong under the form of legislative regulation."

And in the third case this language is found:

"Where property has been clothed with a public interest, the legislature may fix a limit to that, which shall in law be reasonable for its use. This limit binds the court as well the people. If it has been improperly fixed, the legislature, not the courts, must be appealed to for the change."

But this language must be construed in connection with the question at issue. That question was this: The railroads were insisting that the legislature was without power; that the question of what were or not reasonable rates was purely a judicial question, and to be determined by the courts alone. The court overruled the claim of the companies and sustained the power of the legislature. What was the power accorded to the legislature? Simply the power to fix reasonable rates. That it was not intended to decide that the legislature had power to fix any rates, reasonable or unreasonable, is obvious from the subsequent language of the same chief justice in the later case of *Stone* v. *Trust Co.*, 116 U. S. 307, 6 Sup. Ct. Rep. 334, in which, delivering the opinion of the court, he says:

"From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and freights, the state cannot require a railroad corporation to carry persons or property without reward; neither can it do that which in law amounts to a taking of private property for public use, without just compensation, or without due process of law."

This language is quoted with approval by Mr. Justice GRAY in delivering the opinion of the supreme court in the case of *Dow* v. *Beidelman*, 125 U. S. 689, 8 Sup. Ct. Rep. 1028. It is obvious from these last quotations that the mere fact that the legislature has pursued the forms of law in prescribing a schedule of rates does not prevent inquiry by the courts; and the question is open, and must be decided in each case, whether the rates prescribed are within the limits of legislative power, or mere proceedings which in the end, if not restrained, will work a confiscation of the property of complainant. Of course, some rule must exist, fixed and definite, to control the action of the courts, for it cannot be that a chancellor is at liberty to substitute his discretion as to the reasonableness of rates for that of the legislature. The legislature has the discretion, and the general rule is that, where any officer or board has discretion, its acts within the limits of that discretion are not subject to review by the courts. Counsel for complainant urge that the lowest rates the legislature may establish must be such as will secure to the owners of the railroad property a profit on their investment at least equal to the lowest current rate of interest, say 3 per cent. Decisions of the supreme court seem to forbid such a limit to the power of the legislature in respect to that which they apparently recognize as a right of the owners of the railroad property to some reward; and the right of judicial interference exists only when the schedule of rates established will fail to

secure to the owners of the property some compensation or income from their investment. As to the amount of such compensation, if some compensation or reward is in fact secured, the legislature is the sole judge.

The question is then one alone of policy. Whether, by reducing the compensation to a minimum, railroad enterprises shall be discouraged, or, enlarging, encouraged, is a matter for legislative, and not judicial, determination. Take a kindred matter. It is within the power of the legislature to prescribe the rate of interest and to punish by severe penalties the exaction of larger than the legal rate. What that legal rate shall be is not for the courts, but the legislature, to determine. Suppose the legislature of Iowa should reduce the legal rate of interest to 1 per cent., although such legislation would prevent capital from coming into the state, would the courts have power to declare the law unconstitutional? In like manner the rulings of the supreme court imply that the legislature may reduce railroad rates until only a minimum of compensation is secured to the owner. The rule, therefore, to be laid down, is this: That where the proposed rates will give some compensation, however small, to the owners of the railroad property, the courts have no power to interfere. Appeal must then be made to the legislature and the people. But where the rates prescribed will not pay some compensation to the owners, then it is the duty of the courts to interfere, and protect the companies from such rates. Compensation implies three things: Payment of cost of service, interest on bonds, and then some dividend. Cost of service implies skilled labor, the best appliances, keeping of the road-bed and the cars and machinery and other appliances in perfect order and repair. The obligation of the carrier to the passenger and the shipper requires all these. They are not matters which the carriers can dispense with, or matters whose cost can by them be fixed. They may not employ poor engineers, whose wages would be low, but must employ competent engineers, and pay the price needed to obtain them. The same rule obtains as to engines, machinery, road-bed, etc., and it may be doubted whether even the legislature, with all its power, is competent to relieve railroad companies, whose means of transportation are attended with so much danger, from the full performance of this obligation to the public. The fixed charges are the interest on the bonds. This must be paid, for otherwise foreclosure would follow, and the interest of the mortgagor swept out of existence. The property of the stockholders cannot be destroyed any more than the property of the bondholders. Each has a fixed and vested interest, which cannot be taken away. I know that often the stockholder and the bondholder are regarded and spoken of as having but a single interest; but the law recognizes a clear distinction. A mortgage on a railroad creates the same rights in mortgagor and mortgagee as a mortgage on my homestead. The legislature cannot destroy my property in my homestead simply because it is mortgaged, neither can it destroy the stockholders' property because the railroad is mortgaged. It cannot interfere with a contract between the company mortgagor and the mortgagee, or reduce the stipulated rate of interest; and so, unless that stipu-

lated interest is paid, foreclosure of course follows, and the mortgagors' rights, the property of the stockholders, are swept away. Whatever individuals may do by private contract to modify existing rates of interest, the legislature has no compulsory power in the matter. While, by reducing the rates, the value of the stockholders' property may be reduced, in that less dividends are possible,—and that power of the legislature over property is conceded,—yet, if the rates are so reduced that no dividends are possible, and especially if they are such that the interest on the mortgage debt is not earned, then the enforcement of the rates means either confiscation, or compelling, in the language of the supreme court, the corporation to carry persons or property without reward.

Let me notice some objections which are made to this limit of the power of the legislature, both generally and as applied to the present case. It is said that the complainant is a foreign corporation, permitted simply as an act of grace to do business in this state, and that the legislature may therefore impose such terms and conditions upon its doing business in the state as it sees fit; that the carrier is not bound to continue in business, and, if he finds the rates imposed by the state not remunerative, may abandon the business. Whatever of force there may be in such arguments, as applied to mere personal property capable of removal and use elsewhere, or in other business, it is wholly without force as against railroad corporations, so large a proportion of whose investment is in the soil and fixtures appertaining thereto, which cannot be removed. For a government, whether that government be a single sovereign or one of the majority, to say to an individual who has invested his means in so laudable an enterprise as the construction of a railroad, one which tends so much to the wealth and prosperity of the community, that, if he finds that the rates imposed will cause him to do business at a loss, he may quit business, and abandon that road, is the very irony of despotism. Apples of Sodom were fruit of joy in comparison. Reading, as I do, in the preamble of the federal constitution, that it was ordained to "establish justice," I can never believe that it is within the power of state or nation thus practically to confiscate the property of an individual invested in and used for a purpose in which even the Argus eyes of the police power can see nothing injurious to public morals, public health, or the general welfare. I read also in the first section of the bill of rights of this state that "all men are by nature free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness;" and I know that, while that remains as the supreme law of the state, no legislature can directly or indirectly lay its withering or destroying hand on a single dollar invested in the legitimate business of transportation. Nor is it certain that the owner can abandon his business of transportation, even if he wishes. More than once a party receiving such a franchise has been compelled by the courts, by the summary remedy of *mandamus*, to continue his business, and to perform the duties of the franchise which he has received. Again, it is said that this complain-

ant's road runs through other states; these states may impose no schedule of rates; part of its business is interstate, and only congress can limit that; so that from the business elsewhere revenues may be earned which will enable it to make up any deficiency in this state. But the invalidity of this schedule does not depend upon legislation or action elsewhere. If this schedule may be put in force here, a similar one may be in Illinois, Minnesota, and other states through which the company's road runs. For some purposes its property in this state is separate and distinct from its property elsewhere, and out of this property within this state it is entitled to receive some compensation. Robbing Peter to pay Paul has never received judicial sanction. Again, it is said that it cannot be determined in advance what the effect of the reduction of rates will be. Oftentimes it increases business, and who can say that it will not in the present case so increase the volume of business as to make it remunerative, even more so than at present. But speculations as to the future are not guides for judicial actions; courts determine rights upon existing facts. Of course, there is always a possibility of the future; good crops may increase transportation business, poor crops reduce; high or low rates may likewise affect; but the only fair judicial test is to apply the rates to the business that has been done in the past, and see whether upon that basis such rates will be remunerative, or compel the transaction of business at a loss.

Coming now to the question of the schedule as presented, I remark that the schedule as a whole must control, and its validity or invalidity does not depend upon the sufficiency or insufficiency of the rates for any few particular subjects of transportation. Secondly, the fact that it is higher or lower than other schedules in force elsewhere, or at other times in this state, does not necessarily determine its validity. I have had presented to me a volume of testimony in the way of affidavits, schedules, and comparisons, much of which testimony in my mind has only an indirect bearing upon the question. It is not established clearly that this schedule will deprive the complainant of compensation, and yet it seems probable that it will. Confessedly, the schedule is a reduction from that heretofore in force in the state. It is undoubtedly less than that in force in the neighboring states. The affidavit of Henry C. Wicker, the traffic manager of complainant, shows that he has made examinations of the gross earnings of the road in several states on local and also on part of the interstate business during the year 1887, and from such comparison finds that the reduction in revenues, if this schedule be applied uniformly to all business of the company, would be a sum exceeding the amount paid out in dividends in each of the three preceding years, and that the effect would be to prevent the railroad company from declaring any dividends. Other affidavits are filed showing the amounts of dividends heretofore paid, and the difference between the schedule of the commissioners and those heretofore in force. Of course I know that affidavits are unsatisfactory testimony, and that it would be the height of folly to say that this testimony clearly shows that such would be the effect of this schedule. But this is an application only for a preliminary

injunction, and upon such application probabilities are to be considered, and the injuries which would result to either of the parties by the granting or refusing of the injunction. Certainly it would be a great hardship to the complainant for this schedule to be put in force, if its effect was to deprive it of compensation. On the other hand, what injury would result to the defendants or the shippers, the parties really interested on that side of the controversy, if the enforcement of the schedule be temporarily stayed? Besides the common-law remedies for unreasonable charges, this law, in sections which are unchallenged, forbids a a carrier to demand or receive any unreasonable charge, and by section 9 gives to any shipper from whom any unreasonable charge is exacted the right by suit to recover treble damages and his counsel fees. Surely that appears reasonable protection against overcharges. Under those circumstances.it would seem no more than fair that the restraining order be continued in a preliminary injunction. Certainly, if on full investigation it appears that the schedule of rates will not secure to the complainant some compensation for its investment, some income from its business, neither these defendants as officers or individuals, nor the people of this state, would wish to see it enforced. Every man's sense of justice says this, and no one ought to hesitate to have such a question fully heard and determined.

I have endeavored in this case to discuss only the three most important questions; those which seem to me vital to the controversy. Before closing, I must, however, notice two objections made by defendants: First, that the publication of this schedule is, of itself, no invasion of complainant's rights; that no immediate trespass is threatened, and therefore no injunction should issue. But equity interferes to prevent a multiplicity of suits, and where one act may be the foundation of many suits, courts have a right, and it is their duty, in the first instance, to stay that act if unlawful. Take this illustration: Suppose a board of assessors was charged with a duty of assessing property of the complainants, and that, after such assessment was made, an apportionment of the property between a hundred different townships was to follow, and then warrants of collection be issued and served by officers of these townships. Now, if the property of the company was in fact exempt from taxation, would it be contended that it might not have injunction to stay the assessment, rather than wait to litigate with the hundred different collectors the validity of their warrants? And in this case, beyond the mere matter of multiplicity of suits, is the fact that the penalties imposed are large, and, while that of itself might not justify interference, it certainly adds force to the argument of multiplicity of suits. Another matter is this: Defendants say that publication of the schedule was in fact complete, and, therefore there is nothing for the court to act upon. The law requires publication of notice for two successive weeks. As a matter of fact, a notice was published on June 14th and June 21st that the schedule would go into effect on the 28th day of June. On June 21st the complainant and three other corporations telegraphed to the defendants requesting that the date for taking effect for the schedule of

Iowa rates be deferred from June 28th to July 5th, to which this answer was sent: "Answering your message of last evening, time extended to July 5th. W. W. AINSWORTH, Sec'y,"—and a new notice designating July 5th was sent to the papers for publication, which notice was published once before the restraining order of this court was served upon defendants, and then the publication was discontinued. It is insisted by defendants that this action was taken, not by the board, but by one commissioner acting independently, the others neither consenting nor being present or aware of it. Upon this matter there was considerable discussion, both as to the sufficiency of the notice, the number of times publication was required, the fact of the two publications of the first notice, the power of one commissioner to make the change, etc. I deem it unnecessary to consider these, nor do I express any opinion upon the rights of any other corporations than the four who united in the telegram to defendants. An official board acts through its secretary. This complainant, with others, addressed an official communication to the board. It received an answer in the regular way,—one signed by the secretary as secretary. Equity and good faith forbid going behind such official notification.

These are all the matters that require notice. A preliminary injunction will issue in accordance with the terms of the restraining order, and complainant will give bond in the sum of $50,000 to answer for all damages which the defendants or any persons injured by this restraining order may sustain if it shall turn out finally to have been improperly issued.

1. COURTS—FEDERAL COURTS—SUITS AGAINST STATES.
   A suit by a railroad company chartered in one state, in a federal court, to restrain railroad commissioners of another state from putting in force a schedule of rates, is not a suit against a state, within the meaning of the eleventh amendment to the constitution of the United States. *Railway Co.* v. *Dey,* *ante,* 865.