## CAPITAL CITY GASLIGHT CO. v. CITY OF DES MOINES.

### (Circuit Court, S. D. Iowa, C. D. January 8, 1896.)

**1. CORPORATIONS—CHARTER—IMPLIED POWERS.**

When a company is incorporated, either by a special act, or under the general laws of a state, with the power to manufacture and sell gas, the power to charge and collect reasonable rates for the gas manufactured is implied, and forms a part of its contract with the state.

**2. CONSTITUTIONAL LAW—IMPAIRING OBLIGATION OF CONTRACTS—ACT OF MUNICIPAL CORPORATION.**

An ordinance of a municipal corporation regulating the exercise of the franchise of a private corporation within its limits, adopted in pursuance of authority delegated by the legislature of the state, is the act of the state, and, if in excess of its power to regulate or modify such franchise, is void, as impairing the obligation of a contract. New Orleans Waterworks Co. v. Louisiana Sugar-Refining Co., 8 Sup. Ct. 741, 125 U. S. 18, followed.

**3. EQUITY PRACTICE—PRELIMINARY INJUNCTION—REASONABLE RATES.**

The C. Gas Co. brought suit against the city of D. to restrain the enforcement of an ordinance fixing the prices of gas. The right of the plaintiff to the relief sought was found by the court to depend upon the reasonableness of the rates fixed. Upon an application for a preliminary injunction, the proof left some doubt upon the question of the amount which the plaintiff was entitled to regard as its investment, as well as upon the actual cost of producing the gas. It appeared, however, that the rates fixed by the ordinance would permit some profit over cost of production, and that the plaintiff would not be irreparably damaged by the enforcement of the ordinance. *Held*, that taking into consideration these facts, and also that the ordinance was prima facie valid; that its actual effect in increasing consumption and net profits, or the reverse, could not be known, except by experience; and that a final hearing, upon full proof, could be had without great delay,—the preliminary injunction should be refused.

Cummins & Wright, for plaintiff.
J. K. Macomber and William Connor, for defendant.

WOOLSON, District Judge. The plaintiff above named, a citizen of the state of Iowa, is a corporation organized September 10, 1875, under the general statutes of that state, with a corporate term of 50 years, providing for the incorporation of "corporations for pecuniary benefit." The defendant, a citizen of the said state of Iowa, is a municipal corporation incorporated under the general statutes of that state providing for the incorporation of cities. Under the classification established by said statutes, the defendant is a city of the first class. On March 20, 1876, the defendant city, by its municipal council, duly passed an ordinance whose details need not be set out in full. The second section of such ordinance declared the above-named plaintiff to be "hereby vested with the right of building and operating gasworks in the city of Des Moines, and of using the streets and alleys of said city as now or hereafter to be laid out, for the purpose of laying gas mains and service pipes to provide said city and its inhabitants with illuminating gas," etc. In section 4 of said ordinance it is provided that, "in consideration of the privileges herein granted to said company, said company agrees to bind

itself to and with the said city to furnish said city with all the gas the city may use in its public lamps, buildings, and offices," etc., for the term of 10 years. The price is fixed to be charged to the city for said gas for the said term of 10 years. Section 6 provides that the "privilege and license hereby granted is upon the condition that said company shall," on or before December 1, 1876, have their works "in condition to supply gas," etc. This ordinance also fixes the price of gas to the individual consumers. It further provides for the lessening of price of gas, if, by subsequent discoveries in the process, etc., of manufacturing gas, the cost of such manufacture shall be materially reduced, etc. The gas company duly accepted the provisions of said ordinance, and proceeded to perfect its gas plant, extend its mains, etc. On January 9, 1885, said city, by its said council, duly passed an ordinance repealing the ordinance above described, and substituting another in its stead. The latter ordinance, in its general terms, except as to price to be charged for gas, is similar to that which is repealed. Some of its details slightly differ, but, so far as pertains to the matter now on hearing, the ordinances, except as to price of gas, are substantially the same. Price of gas to the city and to the consumer is fixed for 10 years thereafter. Section 7 provides that the privilege and license thereby granted are upon the condition that the company shall at all times, unless temporarily prevented by unavoidable accident, have its works in condition to supply all the gas which may be required by the city, or citizens thereof, etc. The gas company duly accepted the provisions of this ordinance, according to the manner prescribed therein. On February 22, 1892, said city, by the said council, passed another ordinance, by whose terms it was provided that "every person, firm, or corporation furnishing to the inhabitants of Des Moines illuminating gas * * *. shall be entitled to charge and receive therefor" prices therein named, which prices were much lower than those named in the ordinance of January, 1885. Litigation followed the attempted enforcement of the ordinance of February, 1892; resulting in a decree of the district court in and for Polk county, Iowa, which declared said 1892 ordinance invalid, and enjoined the said city from enforcing the same. On May 16, 1895, the said city, by its council, passed another ordinance (being the ordinance in controversy herein), which was approved by the mayor, and has been duly published. The scope of such ordinance is well stated in its title:

"To fix the price of illuminating gas, and to prescribe the conditions under which persons and corporations dealing in illuminating gas can occupy and use the streets and alleys of the city of Des Moines."

Section 1 provides—

"That every person, firm, or corporation furnishing to the inhabitants of the city of Des Moines illuminating gas shall be entitled to charge and receive therefor the following prices, and no more, viz.: For illuminating purposes, $1.40; for fuel purposes, $1.10,—per thousand cubic feet, with a discount of ten cents per thousand cubic feet, if paid on or before the 15th day of the month following that in which the gas is furnished. The above prices are for illuminating gas being an illuminating power of not less than twenty-four candle power; gas having less candle power shall be furnished at a proportionate less rate per candle power."

Other sections fix the price of gas furnished to the city; provide for filing reports of all gas furnished, the furnishing and placing of meters, of service pipes, etc. Section 4 provides:

"Any person, firm, or corporation which shall accept the rights and privileges provided for in this ordinance, and which now has its service pipes in the streets and alleys of the city of Des Moines, may, when necessary, continue to lay its gas pipes and service pipes in the streets and alleys of the city: provided, that they are so laid that they do not obstruct the water and other pipes and sewers laid on the streets and alleys, and other necessary pipes which may be laid: provided, that nothing contained in this ordinance shall be construed to grant any rights or franchises other than the right to continue to furnish the city and its inhabitants with illuminating gas so long as the city may consent thereto: and provided, nothing herein shall abridge the right of the city of Des Moines to make such further additional regulations as it may deem to be necessary to fully protect its citizens."

Section 5 provides:

"In the event that any person, firm, or corporation shall refuse to furnish gas at the rate herein prescribed, the city reserves the right to declare a forfeiture of all rights granted and exercised by such person, firm, or corporation, and to compel said person, firm, or corporation to vacate the streets and alleys of said city within a reasonable time after the passage of a resolution directing the same."

The bill herein filed by plaintiff is to restrain the defendant city from enforcing said ordinance of May, 1895, and the present hearing thereon is on plaintiff's application for a temporary injunction. A demurrer to the jurisdiction of this court was presented by the city, and, after extended hearing, was overruled. Thereupon a large mass of testimony was introduced in support of and in opposition to the application for preliminary injunction; such testimony including a large part of the evidence introduced on the trial above referred to, before the district court of Polk county, Iowa, as well as affidavits and testimony here originally presented. Plaintiff's claim is that the ordinance of May, 1895, is invalid because it is in violation of the constitution of the United States, in the following respects: (1) Impairs the obligation of the contract held by said company; (2) takes the private property of said company for public use without just compensation; (3) deprives said company of its property without due process of law; and (4) denies to said company the equal protection of the laws. Counsel upon either side have favored the court with elaborate briefs, and have pressed for decision the questions involved herein with the ability and energy their importance merits. These questions have largely come into public importance in the later years. "The lamps of precedent," as has been aptly stated, "afford us but a dim and glimmering light" in our endeavors to ascertain much of the true way in this investigation. But the general legal questions involved present far less of difficulty in their solution than in their application. Counsel do not so much disagree on what the law is, as to what part of it is applicable herein, and the manner of its application.

That the charter of an incorporation is a contract, was placed beyond controversy in the celebrated Dartmouth College Case, 4 Wheat. 518. Whether a charter is given directly, by act of the legislative body, or whether articles of incorporation or association are

adopted under general statutes theretofore enacted by such legislative body, is not material on this point.    In Miller v. State, 15 Wall. 478, when speaking of a railway company which was organized under the general statutes of the state of New York providing for incorporation of railroad companies, the supreme court say:

"Undoubtedly, the powers and privileges of the railroad company in this case are the same as they would have been if the company had been incorporated by a special act; and it may be conceded that the charter, when the articles of association were filed in the office of the secretary of the state, became an executed contract," etc.

So, in Chicago, B. & Q. R. Co. v. Iowa, 94 U. S. 155, Waite, C. J., says:

"The Burlington & Missouri River Railroad Company, the benefit of whose charter the Chicago, Burlington & Quincy Railroad Company now claims, was organized under the general corporation law of Iowa, with power to contract, in reference to its business, the same as private individuals, etc. This is, in substance, its charter, and to that extent it is protected as a contract; for it is now too late to contend that the charter of a corporation is not a contract, within the meaning of the clause of the constitution of the United States which prohibits a state from passing any law impairing the obligation of a contract."

Included in the present problem are two factors,—one, the charter and articles of incorporation of plaintiff; the other, the ordinances of the city.    By the statutes of the state, the control over the streets and alleys of the city is vested in the city council.    Without the city's assent, plaintiff might not lay its mains, etc., in such streets and alleys.    The ordinance above described assented to such use.    Plaintiff claims, as to these two factors, that by the charter plaintiff became and was authorized, during its corporate life, and as a part of its contract with the state, to manufacture and sell gas products, and to charge and collect reasonable rates for the gas it manufactured and sold, and that by its acceptance of, and expenditure of funds, etc., in carrying out, the provisions of said ordinances of 1876 and 1885, such contract became effective, and included the right to plaintiff to manufacture and sell gas products, during its corporate life, in the city of Des Moines, and to charge and collect reasonable rates therefor.    Counsel have not referred the court to any authoritative case which has squarely decided the points just named.    But the reasoning of the courts in a number of cases is strongly persuasive of the view just stated. In Reagan v. Trust Co., 154 U. S. 393, 14 Sup. Ct. 1047, Justice Brewer, in delivering the unanimous opinion of the court, with reference to the railroad company, against whom the state attempted to enforce the schedule of rates for carriage of freight, says:

"The railroad company is a corporation created in the state of Texas. The charter which created it is a contract whose obligations neither party can repudiate without the consent of the other. All that is within the scope of the contract need not be determined. Obviously, one obligation assumed by the corporation was to construct and operate a railroad between the termini named; and, on the other hand, one obligation assumed by the state was that it would not prevent the company from constructing and operating the road. If the charter had in terms granted to the corporation power to charge and collect a definite sum per mile for the transportation of property, it would not be doubted that the express stipulation formed a part of the obligation of the state, which it could not repudiate.    Whether, in the absence of an express stipula-

tion of that character, there is not implied, in the grant of the right to construct and operate, the grant of a right to charge and collect such tolls as will enable the company to successfully operate the road and return some profit to those who have invested their money in the construction, is a question not as yet determined."

In Peik v. Railroad Co., 94 U. S. 164, Chief Justice Waite apparently states the point in stronger language than that of inquiry, as raised in the Reagan Case. Having quoted a statement of counsel as to the intention of the legislature in reserving the right to amend laws pertaining to corporations, he further quotes counsel:

"The privilege, then, of charging whatever rates it may deem proper, as a franchise, may be taken away under the reserved power; but the right to charge a reasonable compensation would remain as a right under the general law governing natural persons, and not as a special franchise or privilege."

The learned chief justice then proceeds to state:

"Without stopping to inquire whether this is the extent of the operation of this important constitutional reservation, it is sufficient to say that it does, without any doubt, have that effect."

In Stone v. Trust Co., 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, after stating the principle relating to exemption in the charter from subsequent regulating or altering legislation, the court say:

"Such being the rule, such its practical operation, we return to the special provisions of the charter on which this case depends, and find, first, the authority given the corporation to carry persons and property. This, of itself, implies authority to charge a reasonable sum for the carriage."

When plaintiff incorporated, the state had neither fixed the prices for the sale, nor attempted to regulate the sale, of gas products. The state has since then enacted no such statute. But in 1888 a statute was passed conferring on defendant and other cities of the first class the "right to regulate the price of gas." Laws 22d Gen-Assem. Iowa, c. 16. Section 1090 of the Code of Iowa (section 1640, McClain's Code) was in force at date of incorporation of plaintiff. By that section the state reserved to itself to amend, alter, abridge, etc., all articles of incorporation, and to regulate or subject to conditions every franchise thereafter obtained. Without such reservation, the general assembly might itself have imposed a reasonable rate as a maximum charge for gas. This principle has been frequently declared by the supreme court. Under this right reserved to the state to alter, regulate, etc., this statute of 1888 is conceded to be valid, in the power conferred on the city "to regulate the price of gas." And this statute, enacted under the right which the state thus reserved to itself, does not impair its contract with the plaintiff, but is in accordance therewith.

Previous to the enactment of the last-named statute, the defendant city had, by its ordinance, agreed with plaintiff as to prices which plaintiff might charge for 10 years thereafter, to wit, until 1895. Counsel are agreed that the prices named in such ordinance were the contract prices, as between the city and gas company, until the expiration of said ordinance period. Now, let us suppose the city, at the end of such term, had passed no other ordinance as to rates to be charged for gas. Under the theory advanced by

counsel for the city, no ordinance provision as.to rates would then be in force, and the company would have the right to charge reasonable rates, and no more.  This, I understand, is also conceded by counsel for the gas company.  In the absence of agreement on rates, between the city and the company, what authority had the city under the statute of 1888?  It was authorized "to regulate the price of gas."  Counsel upon both sides concede that under this authority the city could legally fix, as a price for gas, only such price as was a reasonable rate or price therefor.  Counsel may and do differ as to what elements properly enter into the reasonableness of such price or rate.  But the city had the power "to regulate" by fixing by ordinance, in the manner attempted, a reasonable price or rate.  If the rate or price is so low that it is not reasonable, then counsel for city concede the city has not acted under and in accordance with the authority granted.  (It is due to counsel that I add, as touching such concession, that they claim, however, this court has not jurisdiction herein to determine the question of such unreasonableness of price, unless the same shall be, in effect, confiscatory.)

Counsel for the city contend that the company has no contract rights which have been, or are susceptible of being, impaired by the city, even should the rates fixed by the ordinance of May, 1895, be declared unreasonable; in other words, that no contract rights, as to price of gas, are possessed by the company, and that, so far as impairing the contract is concerned, the city is not limited as to the price it may establish.  The reasoning underlying this case seems to me to establish the contrary.  Under its articles of incorporation, the company was authorized and empowered—such was the 'contract of the state—to construct and operate, within the state, and during its corporate life, said gas works, conformably to its articles and to the laws of the state.  The state reserved the right to alter and amend those articles, and to modify or change the franchise or contract the company held thereunder.  But the state has not attempted such modification.  The state exercised the power it possessed as to fixing the price of gas, not by a statute directly fixing therein such price, but by delegating that power or right to the city.  But this in no manner changed the franchise or contract held by the company.  It had theretofore the right to charge reasonable rates.  It yet had that power, and to the city was delegated the authority to fix or establish what such reasonable rates were.  The state might have created a state gas commission, after the general nature of the railroad commission heretofore created in this state.  To this gas commission might have been entrusted the fixing or regulating prices for gas, and the general supervisory control of gas companies, within the state.  But, instead, the state delegated to the several cities of the first class this right or authority to regulate the price for gas.  The validity of such act of the state is conceded in this action.  But the city does not claim that by this statutory delegation of authority the city was authorized to do what the state could not legally do directly, viz. fix a rate which is not reasonable, nor that the right

of the gas company to charge and collect reasonable rates is altered or abridged by such statutory delegation. Whatever contract theretofore existed, if any, in favor of the company, in that direction, and arising out of its incorporation, still existed, with unimpaired force. The city ordinance established rates which were thereafter, prima facie, reasonable rates. But, from the very nature of the business for whose transaction the company was incorporated, the locality of such business must be in a city. Only in localities where citizens are closely and numerously located can such business profitably be carried on. The statutes of the state, at the time of the company's incorporation, gave to the cities such control of their streets and alleys,—such general authority within their boundaries,—as that, without the consent of the city, the company could not carry on its business within such city. Hence the necessity for such consent as was given in the ordinances of 1876 and 1885. By those ordinances the city expressly contracted with this company for the erection and operation, within such city, of its gas plant, and the putting down in the streets and alleys of the city, of its main and other gas pipes. The gas company perfected its plant, and so laid its pipes, under such consent. Thus, there came to the gas company—subject, of course, to any lawful act of the general assembly of the state as to amendment of the statutes relating to incorporation thereunder and franchises obtained therefrom, and thus affecting the statutory rights of plaintiff—the contract rights: (1) As a corporation, under its articles of incorporation, to exist and carry on its business within the state during its corporate life; and (2) as a corporation, under said ordinances, to exist and carry on its business within said city. I do not mean that the city had no control whatever with reference to the manner in which plaintiff should carry on its said business within the city. But such control must be so exercised that plaintiff will not be thereby deprived of the exercise of its right to properly and lawfully carry on such business. But, say counsel for the city, the statute, in authorizing the city to fix or regulate the price of gas within its municipal boundaries, conferred only the right or authority to fix reasonable rates; hence, if the city shall fix rates which are not reasonable, such municipal action is not in accordance with the statutory delegation of authority, but in excess of and outside of such delegation, and hence is not authorized by the statute, and is not the act of the state, and therefore there is no action of the state impairing any obligation of contract. This point received consideration in New Orleans Waterworks Co. v. Louisiana Sugar-Refining Co., 125 U. S. 18, 8 Sup. Ct. 741. Mr. Justice Gray, speaking for a unanimous court, says:

"In order to come within the provision of the constitution of the United States which declares that no state shall pass any law impairing the obligation of contracts, not only must the obligation of a contract have been impaired, but it must have been impaired by a law of the state. * * * As later decisions have shown, it is not strictly and literally true that a law of a state, in order to come within the constitutional prohibition, must be either in the form of a statute enacted by the legislature in the ordinary course of legislation, or in the form of a constitution established by the people of the state

as their fundamental law. In Williams v. Bruffy, 96 U. S. 176, 183, it was said by Mr. Justice Field, delivering judgment, 'Any enactment, from whatever source originating, to which a state gives the force of law, is a statute of the state, within the meaning of the clause cited, relating to the jurisdiction of this court.' * * * So a by-law or ordinance of a municipal corporation may be such an exercise of legislative power delegated by the legislature to the corporation, as a political subdivision of the state, having all the force of law within the limits of the municipality, that it may properly be considered as a law, within the meaning of this article of the constitution of the United States."

To the same general effect is the opinion of the supreme court rendered in Hamilton Gaslight & Coke Co. v. Hamilton City, 146 U. S. 258, 13 Sup. Ct. 90.

In Wright v. Nagle, 101 U. S. 791, the supreme court, speaking of a legislative grant of franchise, say:

"The legislature may exercise this authority by direct legislation, or through agencies duly established, having power for that purpose. The grant, when made, binds the public, and is, directly or indirectly, the act of the state. The easement is a legislative grant, whether made by the legislature itself, or by any of its properly constituted instrumentalities."

And it does not appear why the same reasoning shall not apply equally in the matter of fixing rates of gas.

The conclusion necessarily follows, under the pleadings in this case, that the ordinance in controversy is, within the meaning of the constitutional provision, the law of the state, for the purposes of the action. If it impairs the obligation of the contract held by the city, it must be declared invalid. And if the rates therein fixed are unreasonable, to such extent as to justify such action, the restraining writ of this court must be issued, because of said ordinance impairing contract obligations to whose enjoyment the plaintiff is entitled.

Passing now to the consideration of the remaining points of attack made herein by plaintiff, and for the present deferring the consideration of the evidence introduced, we may, without detriment to plaintiff in this action, eliminate from our inquiry the second point,—whether the private property of plaintiff is, by the ordinance in question, taken for public use without just compensation. Indeed, we may pass over so much of argument of counsel on either side as relates to this point. For, if the ordinance is violative of the United States constitution as to either of the other two points (depriving plaintiff of its property without due process of law, or denying to plaintiff the equal protection of the laws), the ordinance must be decreed to be invalid in so far as it thus operates. And, without attempting to particularize, it is apparent from argument of counsel that counsel upon either side agree in the position that, unless the evidence shall sustain one or both of the two points named, it would, in this action, fail to sustain that as to the taking of plaintiff's property for public use without just compensation. It is therefore unnecessary to decide, as between conflicting claims herein, whether the constitutional prohibition just stated could be properly applied in the action. Defendant contends that "taking of property without due process of law" is but an equivalent phrase for its "practical confiscation." In their printed ar-

gument, counsel for defendant say, after quoting the provision of the United States constitution, "Nor shall any state deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws" (Amendment 14, § 1):

"We understand the foregoing provisions of the constitution to be violated only when, as applied to the facts in the case, the rate fixed by the council would afford no compensation whatever, or only a nominal compensation upon the actual investment."

Under the view hereinafter presented of the matters now in hearing, it becomes unnecessary for us to follow the line of argument presented by counsel as establishing the foregoing proposition. The opinions filed by the supreme court have not presented —at least, in express language—the views held by that court on the proposition of counsel just quoted. But, if I correctly apprehend the argument of counsel, an error is committed when counsel seek to measure the jurisdiction of this court in this case by the remarks of the supreme court in regard to the jurisdiction possessed by them in cases brought into that court by writ of error from the highest court of a state. Whatever doubt may have obtained, none now exists, under repeated decisions of the supreme court, that the jurisdiction of that court in the last-described class of cases is solely where the decision of the state court has been based on the constitution, statute, or treaty of the United States, and such decision has sustained the claim that the act or law complained of in the court below was not in violation of the federal constitution, statute, etc. In other words, the supreme court does not sit as a court of errors to review the action of the state court on matters of general judicial action, nor as applied to whether the decision of such state court is correct according to the state constitution or the state statutory enactment. But the sole, exclusive jurisdiction of the federal supreme court, in the class of cases named, is where there is actually involved in the controversy, and the state court has based its decision on, some portion of the United States constitution, statute, or treaty, and that decision has sustained and upheld, as valid and constitutional, the act or statute which had been attacked as unconstitutional. In New Orleans Waterworks Co. v. Louisiana Sugar-Refining Co., 125 U. S. 18, 8 Sup. Ct. 741, the supreme court distinguish and declare how different is their jurisdiction when a case is taken from this court on writ of error. Their appellate jurisdiction on writ of error from this court, if the case is reviewable by law, properly taken to that court, is practically limited only by the assignments of error.

Counsel for defendant insist that this court may not pass, in this cause, on the question of the reasonableness of the rates fixed in the ordinance in controversy; that, since the citizenship of the parties is not diverse, this court has not herein the general power, as a court of equity, with which it would be clothed if the parties hereto were of diverse citizenship. I do not regard it necessary to follow this argument to its full length. For manifestly, if a controversy herein is pending as to which one construction of this constitution will

sustain, while a different construction will defeat, the action, then a constitutional question is presented, which confers on this court jurisdiction herein, without regard to citizenship of the parties. This point was considered at some length on the decision herein rendered, sustaining the jurisdiction of the court as against the demurrer of defendant attacking the same. Now, when jurisdiction has thus attached in this court, then any matters which affect the constitutional questions presented are properly before the court for consideration. Charges are here directly presented by the plaintiff, that, by the ordinance in controversy, plaintiff is deprived of its property without due process of law, and is denied the equal protection of the laws. The words of Chief Justice Marshall are here pertinent:

"The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of the jurisdiction which is given than to usurp that which is not given. The one or the other would be treason to the constitution." Cohens v. Virginia, 6 Wheat. 264.

Let us gather a few of the expressions of the courts as to what is included in the terms "depriving without due process of law," and "denying equal protection of the laws."

In Chicago, M. & St. P. Ry. Co. v. Minnesota, 134 U. S. 458, 10 Sup. Ct. 462, 702, Justice Blatchford, delivering the opinion, says:

"The question of the reasonableness of a rate of charge for transportation by a railroad company, involving as it does the element of reasonableness, both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law, and in violation of the constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the law."

### Justice Miller, concurring:

"(3) Neither the legislature, nor a commission acting under authority of the legislature, can establish arbitrarily, and without regard to justice and right, a tariff of rates for such transportation which is so unreasonable as to practically destroy the value of the property of persons engaged in the carrying business, on the one hand, nor so exorbitant and extravagant as to be in utter disregard of the right of the public for the use of such transportation, on the other."

In Stone v. Trust Co., 116 U. S. 307, 347, 6 Sup. Ct. 334, 388, 1191, Chief Justice Waite, delivering the opinion, says:

"From what has thus been said, it is not to be inferred that this power of limitation or regulation is itself without limit. This power to regulate is not a power to destroy, and limitation is not the equivalent of confiscation. Under pretense of regulating fares and profits, the state cannot require a railroad corporation to carry persons or property without reward. Neither can it do that which in law amounts to a taking of private property for public use without just compensation, or without due process of law."

In Railway Co. v. Gill, 156 U. S. 657, 15 Sup. Ct. 484, Justice Shiras, delivering the opinion, says:

"This court has declared in several cases that there is a remedy in the courts for relief against the legislature establishing a tariff of rates which is so unreasonable as to practically destroy the value of the property of companies engaged in the carrying business, and that especially may the courts of the United States treat such a question as a judicial one, and hold such acts of legislation to be in conflict with the constitution of the United States, as depriving the companies of their property without due process of law, and as depriving them of the equal protection of the laws."

In Ames v. Railway Co., 64 Fed. 176, Justice Brewer says:

"The idea of reasonableness is justice, and that which is unjust cannot be reasonable; and, when the strong arm of the legislature is laid upon property invested in railroad transportation, it must be so laid as to do justice to such investors. There can be no justice in that which works to such investors a practical destruction of their property thus invested. It must be borne in mind that property put into railroad transportation is put there permanently. It cannot be withdrawn at the pleasure of the investors. Railroads are not like stages or steamboats, which, if furnishing no profit at one place, and under one prescribed rate of transportation, can be taken elsewhere, and put to use at other places and under other circumstances. The railroad must stay, and, as a permanent investment, its value to its owner may not be destroyed. The protection of the property implies the protection of its value."

In Reagan v. Trust Co., 154 U. S. 397, 14 Sup. Ct. 1047, Justice Brewer, delivering opinion, says:

"The courts are not authorized to revise or change the body of rates imposed by a legislature or commission. They do not determine whether one rate is preferable to another, or what, under all circumstances, would be fair and reasonable as between the carriers and the shippers. They do not engage in any mere administrative work. But still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to make a practical destruction to right of property, and, if found so to be, to restrain its operation."

And on page 399, 154 U. S., page 1047, 14 Sup. Ct., the same justice, in delivering the unanimous opinion of the court, says:

"The equal protection of the laws, which, by the fourteenth amendment, no state can deny to the individual, forbids legislation, in whatever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public. This, as has been often observed, is a government of law, and not a government of men; and it must never be forgotten that, under such a government, with its constitutional limitations and guaranties, the forms of law and the machinery of government, with all their reach and power, must, in their actual workings, stop on the hither side of the unnecessary and uncompensated taking or destruction of any private property legally acquired and legally held."

In Railway Co. v. Dey, 35 Fed. 879, Judge Brewer declared:

"The rule to be laid down is this: That where the proposed rates will give some compensation, however small, to the owner of the * * * property, the courts have no power to interfere. Appeal must then be made to the legislature [in the pending case to the city council] and the people. But, where the rates prescribed will not pay some compensation to the owners, then it is the duty of the court to interfere, and protect the companies from such rates. Compensation implies three things: Payment of cost of service, interest on bonds, and then some dividend."

He closes this branch of his discussion in these words, as applicable to the payment of interest on bonds:

"While, by reducing the rates, the value of the stockholder's property may be reduced, in that less dividends are possible,—and that power of the legislature over property is conceded,—yet if the rates are so reduced that no dividends are possible, and especially if they are such that the interest on the mortgage debt is not earned, then the enforcement of the rates means either confiscation, or compelling, in the language of the supreme court, the corporation to carry persons or property without reward."

But still the question remains whether the matters presented show the ordinance in question impairs the obligation of the contract, deprives plaintiff of property without due process of law, or denies to plaintiff the equal protection of the laws, so that at this point in the case a preliminary injunction should issue.    In the question just stated are included so many factors, the application of the general principles embraced therein so strongly differ, as the peculiar circumstances and conditions of the cases differ; there is absent any special, unfailing test or standard of measurement; in short, each case presented is so largely, and almost wholly, of its own peculiar kind, and the constitution, congress, and the courts have all failed to minutely and specifically define these constitutional provisions, that a court may well approach the matter with great reluctance. The ordinance in controversy is prima facie reasonable, in the rates imposed.    On plaintiff is the burden of proving the contrary.    Unless, when the case is finally submitted on the merits, the plaintiff shall have satisfied the court, by a fair preponderance of the proof, that the rates by the ordinance so fixed, or some of them, are not reasonable, and are so unreasonable as to justify the court in staying its operation, the decree must be for defendant, and the court must refuse to interfere with the enforcement of the ordinance.    We are not, at this point in the case, to determine what decree shall pass on the merits.    The action now to be taken may be in harmony with, or contrary to, the final action; that is, should a preliminary injunction now issue, yet the final decree—the decision on the merits of the case, after evidence has been fully introduced on both sides— may dissolve this injunction, and find for defendant, that the ordinance is valid and enforceable.    While, if the application now pending for a writ of injunction be denied, yet the final decision on the merits may decree the ordinance invalid, as to rates therein fixed, and its enforcement to be stayed.    The extraordinary process of the court—which, if issued, is to stay, until decree herein, the enforcement of the ordinance—may not lightly issue.    The court is bound to assume, until the contrary be proven, that the council of the defendant city have acted with due regard to the rights of the plaintiff, and have established reasonable rates.    The proof introduced on the application now to be decided has not been full or satisfactory in many points, or the case might now be submitted for final decision.    It is not the practice, nor is it expected, that the proof submitted on the application for a preliminary writ shall fulfill all the requirements of the proof to sustain the decree and the permanent writ.    If, on the showing now made, the case presented is such that, were the same convincing judgment present at the final hearing, the writ would be decreed, and the preliminary writ is found necessary for plaintiff's protection meanwhile, such writ may

issue. This is a statement of largest generality. But, as in all such statements, there are many qualifying exceptions and particulars. If the writ shall not issue, will plaintiff suffer irreparable injury? Taking the attitude of the two parties to the suit under the showing now made, how are the two before the court, as to equities, looking at their respective situations if the writ shall, and if it shall not, now be ordered? I think I am safe in saying that the court must be pressed by the proof into finding the preliminary writ necessary to prevent grave and practically irreparable injury to the plaintiff, or the preliminary writ will not issue against the opposition of defendant, however strong the showing. But the parties will be remitted to the decree for settlement and adjudication therein of all matters involved in the suit. In this case the plaintiff has some 2,500 consumers. Of these, at time of hearing the evidence on pending application, only 17 had refused to pay to the plaintiff the old rates. Since then, according to the affidavit filed by plaintiff, though filed without leave, and out of time, the number has risen to 229 refusals, with 144 offering to pay the ordinance rates. Defendant has been given no opportunity to meet the statement of this last affidavit, but the tendency therein shown to refuse to pay old rates, we may safely assume, will probably result in increasing refusals to pay in excess of the new ordinance rates until this cause is decided. How shall the reasonableness or unreasonableness of the ordinance rates be determined? By what test or standard is this fact to be decided? Counsel radically differ in the views presented on this point in the forcible and elaborate printed briefs presented, aggregating over 300 pages. Mr. Justice Brewer, in Ames v. Railway Co., supra, when speaking of rates for transportation of freight on that railway, says:

"What is the test by which the reasonableness of the rates is determined? This is not yet fully settled. Indeed, it is doubtful whether any single rule can be laid down applicable to all cases. If it be said that the rates must be such as to secure to the owners a reasonable per cent. on the money invested, it will be remembered that many things have happened to make the investment far in excess of the actual value of the property,—injudicious contracts, poor engineering. unusually high cost of material, rascality on the part of those engaged in the construction or management of the property. These and many other things, as is well known, are factors which have largely entered into the investments with which many railroad properties stand charged. Now, if the public was seeking to take title to the railroad by condemnation, the present value of the property, and not the cost, is that which must be paid. In like manner, it may be argued that, when the legislature assumes the right to reduce, the rates so reduced cannot be adjudged unreasonable, if, under them, there is earned by the railroad a fair interest on the actual value of the property. It is not always easy to determine the value of railroad property, and, if there is no other testimony in respect thereto than the amount of stock and bonds outstanding, or the construction account, it may be fairly assumed that one or the other of these represents it, and computation as to the compensatory quality of rates may be based upon such amounts. In the cases before us, however, there is abundant testimony that the cost of reproducing these roads is less than the amount of the stock and bond accounts, or the cost of construction, and that the present value of the property is not accurately represented by either the stock and bonds, or the original construction account. nevertheless, the amount of money that has gone into the property—the actual investment, as expressed, theoretically, at least, by the amount of the stock and bonds—is not to be ignored, even though such sum is far in excess of the

present value. It was said in the case of Reagan v. Trust Co., 154 U. S. 412, 14 Sup. Ct. 1059: 'It is unnecessary to decide, and we do not wish to be understood as laying down as an absolute rule, that in every case a failure to produce some profit to those who have invested their money in the building of a road is conclusive that the tariff is unjust and unreasonable. And yet justice demands that every one should receive some compensation for the use of his money or property, if it be possible, without prejudice to the rights of others.' "

In the case at bar, the proof shows the capital stock of plaintiff to be $300,000, and outstanding bonds $200,000. The amount of cash invested in the entire plant,—I now refer, as I have heretofore referred, to the gas plant alone, eliminating entirely the electric plant,—in the entire gas plant, as shown by the construction account of the company, appears a cash investment of $466,532.93, and patent rights purchased of $172,096.94, aggregating $600,000. None of the experts place the cost of reproducing the plant at a sum equal to the stock and bonds. The bonds outstanding were issued almost entirely in payment of certain patent rights which were sold to the gas company. The proof shows that a part of those patents—the exact part is not shown—has expired, so that their present value to the gas company is greatly below the amount of outstanding bonds. Whether, at the time of the purchase of these patent rights,—that is, the right to use the improvements secured by the patents,—the value of the patents to the gas company was properly measured by the bonds given for such purchase, is not fully apparent, but the testimony strongly tends to show that at least it was then so regarded by the parties to the transaction. Yet the circumstances surrounding such transaction have this peculiarity: A Pennsylvania corporation, known as the United Gas Improvement Company, is the owner or manager of a large number of gas plants at different points in the United States, the plaintiff being one of that number. The patents were sold by the United Gas Improvement Company to the plaintiff. While this fact does not of itself impart to the transaction any fraud or bad faith, it nevertheless suggests and demands a more searching inquiry into the details, and a more careful weighing of the facts involved. As to the consideration of such bonds,—I mean, the consideration which is proper to be here considered, and included in the value of this gas plant at present, or on which interest is to be allowed,—the proof does not satisfy me. Such of the bonds as were issued in purchase of patents now expired cannot here be considered, in the attempt to ascertain the basis on which the reasonableness of rates is to be determined, for those patents have now no market value. And if more was originally paid for such expired patents than at the time of their purchase was justified by their importance to plaintiff, and by the length of life they then possessed, an element thereby enters into the loss column of plaintiff's profit and loss account, and is not now to be considered as an active element in fixing reasonable rates. Besides, the proof is that these bonds were issued in purchase of "all the patents that the United Gas Improvement Company owns"; not alone the "patents in use in the city of Des Moines," but also "whether used in this city or elsewhere." Testimony of Lillie (interrogatories 24, 25, 29). So that, confessedly, a

part of the bonds was issued for patents not used at all by plaintiff. Manifestly, these should not be included in arriving at the basis we are now seeking. Nor should there be included any amounts expended or investments made by plaintiff in its attempt or experiment, however laudable these attempts may have been, to supply fuel gas to the citizens of Des Moines, and which were expended or invested in directions not now required, or not properly serviceable for the company's present uses. These must be laid aside, among any other unprofitable investments in the history of the company. These may evidence the creditable desire of the company to keep its works fully abreast with progressive idea of gas making. But they are now of no market value. In other words, the court may not now regard the rates as properly to be increased above what would otherwise be reasonable for the purpose of allowing plaintiff to recoup losses heretofore incurred in any unfortunate or unprofitable investments it has made, or to charge and receive interest on losses thus incurred. In this connection I wish to say that the proof presented on the hearing fully absolves the plaintiff from any rascality on the part of those engaged in the construction or management of plaintiff's property. Having quoted from Justice Brewer, wherein he has used those words, it is but just to plaintiff to state that the proof, without contradiction, shows no presence of dishonest methods or management in plaintiff's business methods or affairs, but, on the contrary, an honest and most creditable business management. In the opinion delivered by Justice Brewer in the case last quoted from (Ames v. Railway Co.), the learned justice, after having considered at some length different elements claimed to be legitimate factors in the basis from which the reasonableness of rates was to be determined, says (page 178):

"Considerations such as these compel me to say that I think there is no hard and fast test which can be laid down to determine in all cases whether the rates prescribed by the legislature [city council] are just and reasonable. Obviously, however, the effect of the reduction upon earnings is the first and principal matter to be considered."

Perhaps the factors which affect the question of earnings—that is, the reasonable cost of manufacture, etc., as applied to income—are not more difficult in this case than generally may be anticipated in like cases. But, between the extremes of the expert testimony introduced on either hand, we have here irreconcilable differences. The cost of manufacture involves many matters wherein this difference of judgment will arise, however honest the expert, and his attempt at unprejudiced opinion, for the basis of the opinions on either hand are from radically differing standpoints of view. Under the proof presented, the plant is in excellent condition and efficiency, and the cost of its reproduction appears to be the substantial equivalent of its value. The estimated cost of reproducing the present gas plant of plaintiff varies, under the proof as presented by the company, from about $450,000 to $500,000. Some proof has been introduced by defendant which places the cost of erecting a plant, laying the mains, and placing the plant in same operative condition in which plaintiff now is, at about $330,000. The evidence, without

contradiction, shows that the plant, under present management, is in excellent condition. Some criticism appears as to whether plaintiff has thrown a proper share of the expense upon the electric light company, which offices with plaintiff, has its works on plaintiff's real estate, and, to a considerable extent, is officered and managed by the same persons as plaintiff. But I see little cause of complaint in this respect. Apparently, the accounts of the two concerns are kept separate, and each charged with its own expense. Except as to a charge—not shown to be made, but which should be made—for use of plaintiff's real estate by the electric light company's works, no improper or unfair element appears, as between these two plants. Defendant insists that a part of the present gas plant is not only unnecessary for present use in supplying gas in Des Moines, but also for probable use in the near future, and that that part of the plant devoted to manufacture of coal gas should not be included in any computation for determining the money value, or in any basis used for determining on what plaintiff may rightfully ask income or profits. The fact that plaintiff has at Des Moines, in operation, two distinct or separate parts of its gas plant,—one for manufacturing coal gas, the other for water gas,—has served to increase greatly the difficulties attending a decision of this matter. If I remember rightly, all the witnesses agree that, the coal-gas plant having been erected and being on the plaintiff's ground, they would not recommend its destruction. There exists a marked difference of opinion among the experts as to whether, if erecting a new plant, they would advise such coal-gas plant to be included as a part of it. The trend of proof is to the effect that the later-built plants are almost exclusively for the manufacture of water gas. But on this point I am not satisfied that it would be improper to include the coal-gas plant, and therefore, for present hearing, retain it as a part of the property to be considered in our calculations as to rates. But its retention complicates the decision herein, for there is thus retained an element whose exclusion would take with it many obstinate and perplexing questions. Returning to the attempt to ascertain the cost of present reproduction of plaintiff's gas plant, or rather of a gas plant which shall be equally efficient and capable in supplying gas to the defendant and its citizens, and examining the proof for that purpose as introduced by plaintiff and defendant, I conclude that suitable and proper real estate could be obtained, and such plant erected, mains laid, etc., with same efficiency to meet demands of the city as that now possessed by plaintiff, for $400,000. The experts sworn on plaintiff's behalf have varied in their figures from about $450,000 to about $500,000. From these estimates must be taken that part of the present plant which was used for fuel gas, and is now not available for present use; also, the overestimate by them made on the real estate; and also making allowance for storage capacity on the holder last erected beyond what seems, under present circumstances, profitably necessary. On the whole proof, I reach the conclusion above announced. The profit and loss statement intro-

duced by plaintiff for the years 1891 to 1894 shows that plaintiff received for gas supplied as follows: 1891, $1.50 per 1000 feet; 1892, $1.55 per 1,000 feet; 1893, $1.59 per 1,000 feet; 1894, $1.56 per 1,000 feet. By reference to this statement for 1894, it will be noticed that plaintiff has charged, as against the gas used by itself, almost $69\frac{1}{2}$ cents per 1,000 feet. I am not authorized, under the proof as to its cost, to assume that this rate was so taken by plaintiff because it regarded that as the actual cost per 1,000 of the gas used by it. But I am not advised why the charge for this gas is thus made. Making allowance for the proportionate discount as shown in such statement, it will be seen that the remainder of gas, —that supplied to city and citizens,—as shown in this 1894 statement, brought to the plaintiff the net rate per 1,000 of $1.57$\frac{1}{2}$. By thus charging gas used by plaintiff at the same rate as that supplied to city and citizens, the average rate obtained for gas supplied would be increased by something over 1 per cent. additional.

We now turn to the cost of making and distributing gas. Here we have the proof by plaintiff, based on its statement of actual expenditures, showing the cost as follows: 1891, $1.056; 1892, $1.15; 1893, $1.23; 1894, 93 cents. Plaintiff insists that the cost (93 cents), as thus shown in the last year named, cannot be taken as a correct basis for the future, because, as it is claimed, of that year's unusually low cost of materials which enter into the manufacture of gas. Plaintiff insists that the correct average, as to cost of gas hereafter, would be the average of these four years, or $1.09 per 1,000 feet. It may be conceded that there appears no full and satisfactory explanation for the dropping from $1.23 in 1893 to 93 cents in 1894. Perhaps one of the reasons may be found in the affidavits of Manager Pratt and Foreman Pugh, and in the tables presented as to the results accomplished under Foreman Pugh's supervision. Certain it is that better results have been accomplished than theretofore seemed possible. The proof fails to show such reductions in material as thereby to account for this decrease in cost to plaintiff for that year. I may here say that all the expert witnesses—even those who testified at the instance of defendant—testify to the manifest ability and efficiency, and the apparent economy, of Mr. Pratt's management. I am not inclined to include in this hearing for the writ, as one of the proper elements relating to cost of gas, the rental of land paid by plaintiff for that part of the real estate on which plaintiff holds a purchase option, but which was not actually and properly occupied by plaintiff in the operation of its gas plant. This rental has been included by plaintiff as one of the expenses, in arriving at the cost of gas as it has given it. While it may be, as claimed, good business policy on part of plaintiff to hold this land under the present option, looking to its purchase hereafter in the growth of the plant, I question whether plaintiff may at this time rightfully insist that this rental shall be placed among its proper expenses, in estimating which proof is not clear but that a small portion of this land was actually and necessarily occupied by plaintiff in operating its gas plant. But I am not able to determine from the proof what part and value, if any,

was thus occupied. This rental, as given in plaintiff's proof, was in 1891 and 1892 $2,502.95; in 1893, $2,428.76; and in 1894, $2,184.91. If these items are disallowed in gross, such disallowance would reduce the actual cost, as given by plaintiff, nearly 5 cents per 1,000 feet in 1891 and 1892, and nearly 4 cents in 1894; thus bringing the cost, in plaintiff's proof, to $1 (about) in 1891, and to 89 cents (about) in 1894.

Turning to the testimony of the experts who testified on behalf of plaintiff as to what, in their judgment, is, or should be, the actual cost in Des Moines of manufacturing and distributing gas, we have the following results: Butterworth, 88 to 94 cents per 1,000 feet; Cowdery, 90 to 98 cents per 1,000 feet; Harper, 90 to 95 cents per 1,000 feet; White, 90 to 95 cents per 1,000 feet; Faber, 90 to 95 cents per 1,000 feet; Wallbridge, 90 to 95 cents per 1,000 feet; Chollar, 92 to 96 cents per 1,000 feet. I will not attempt recapitulation of the evidence of other witnesses, who placed the cost yet lower (some of that evidence bears marked indication of mere speculation on the subject), but will, for present purposes, take 90 cents as the cost per 1,000, in the belief that, under the proof thus far presented, this will be sustained as a fair estimate, and as not below the cost. The proof introduced by plaintiff shows that about 70 per cent. of the gas sold by it was at illuminating gas rates, and about 30 per cent. at fuel gas rates. Applying this percentage to the net rates of the 1895 ordinance, we have each 1,000 feet of gas bringing $1.21 per 1,000 feet. At a cost of 90 cents per 1,000, there will remain 31 cents per 1,000 of profit, or, at the output for 1894, a profit of $17,546. If we now take the cost of reproduction of plaintiff's gas plant, as hereinbefore found, the per cent. of profits on output for 1894, at the 1895 ordinance rates is .0438, or 4⅜ per cent. on cost of reproducing such plant. Under the present state of the proof, I am not satisfied that any allowance should be made on the present hearing for interest on outstanding bonds. The evidence hereafter presented may convince me that this interest, or some part thereof, should be included, in determining what are reasonable rates herein.

It is insisted by defendant that the reduction in price of gas will work a corresponding and large increase in amount consumed, resulting in increase of net profits as well. That some increase in consumption will follow reduction in price, plaintiff admits, but insists that there is no basis for believing such increase will be large, or that the net profits will increase at all. What will be the amount or per cent. of increase in consumption, and whether any increase in profits will result from reduction of rates, is, and must at present be, an uncertain matter. In Railway Co. v. Wellman, 143 U. S. 343, 12 Sup. Ct. 400, Mr. Justice Brewer inquires:

"Must it be declared, as matter of law, that a reduction of rates necessarily diminishes income? May it not be possible—indeed, does not all experience suggest the probability—that a reduction of rates will increase the amount of business, and therefore the earnings? At any rate, must the court assume that it has no such effect, and, ignoring all other considerations, hold, as a matter of law, that a reduction of rates necessarily diminishes the earnings?"

The same learned justice, in the opinion rendered by him on this circuit, as circuit judge, in Railway Co. v. Dey, 35 Fed. 881, when speaking of the application in that case of the possible increase of business as following reduction of rates, uses this language:

"Again, it is said that it cannot be determined in advance what the effect of reduction in rates will be. Oftentimes it increases business, and who can say that it will not in the present case so increase the volume of business as to make it remunerative,—even more so than at present? But speculations as to the future are not guides for action. Courts determine rights upon existing facts. Of course, there is always a possibility of the future; but the only fair judicial test is to apply the rates to the business that has been done in the past, and see whether, upon that basis, such rates will be remunerative, or will compel the transaction of business at a loss."

After all, there can be but one certain method of ascertaining the effect of reduction of rates, and that is the test of experience.

In plaintiff's opening argument, on page 43, appears a table wherein counsel have attempted to apply to a possible increase in business the rates of the 1895 ordinance, as affecting the receipts by the company therefor. Therein is shown a probable reduction in cost per 1,000 feet, as incident to such increased business. Let us take that part of the table, and, instead of placing the cost per 1,000 feet at plaintiff's figures (which are 95 cents), for present consumption, start our table at 90 cents, as above found, and thereafter reducing cost, as consumption increases, the same number of cents per 1,000 as reduced in such table, and we have the following as a result:

| Output. | Cost per M. | Selling Price. | Profit, per cent. per M. | Amt. | Per cent. on Cost of Reproduction. | Per cent. after Paying Int. on $200,000 Bonds. |
|---|---|---|---|---|---|---|
| 56,600,000 | $ .90 | $ 1.21 | .31 | $17,546 | .043 '- | .018 |-|
| 65,000,000 | .85 | 1.21 | .36 | 23,700 | .059 -|- | .034 -|- |
| 75,000,000 | .81 | 1.21 | .40 | 30,000 | .075 | .05 |
| 85,000,000 | .77 | 1.21 | .44 | 37,400 | .093 -|- | .068 -- |
| 95,000,000 | .74 | 1.21 | .47 | 44,750 | .111 -|- | .086 -|- |

This is the result most nearly approaching accuracy at which I have been able to arrive, under the proof presented. I realize that, of necessity, any result, attempted as accurate, must largely rest on probabilities, many of which may easily change, and many, if not all, of which, are shifting factors. But, taking the entire proof, I can do no better at this time. It may be here stated that the proof shows that, during the 20 years in which plaintiff has operated its gas plant, there has been paid in dividends, and in interest on bonds, less than $50,000. Apparently, what profits beyond that amount have been realized from the business have been applied to the building up of plaintiff's plants. Were this the final hearing of this case, and time had proven my computation accurate, and that the increase in consumption had not proportionately and profitably grown in response to decrease in rates, but that substantially the consumption was as now, I should be strongly inclined, with my present view of the law and the facts, to grant a permanent in-

junction, if plaintiff be found entitled to include interest on bonds. There has been invested of cash (so the proof shows), in this gas plant, $466,522.93. In this amount is included nothing relating to the electric light plant, nor any part of the bonds which were given for the right to use gas patents. If these bonds are included, the investment in the gas plant amounts to $641,974.73 according to the proof. And considered from any standpoint of business enterprise, with the risks attending the business, the depreciation naturally occurring to the plant, the repairs which must constantly be in progress, the possibility (always imminent in a business enterprise such as this) of some invention or new process being found which would manufacture some satisfactory illuminant so cheaply as to make further operation of the plant financially impracticable, and the many other matters which must occur to a business mind when considering this gas plant as a financial investment,—all these strongly impress my mind that the per cent. of profit shown by the above table (assuming that interest on the $200,000 bonds should be paid) is not what plaintiff is entitled to under equal protection of the laws with other like business enterprises generally, and that compulsory rates, which only permit charges affording no larger returns, and when the business is carried on with all practicable prudence and economy, are not reasonable rates, and are not compensatory, within the meaning of the term "compensation," as that term is used and construed in the decisions which are binding authority on this court. It will be observed, also, that the figures above tabulated do not provide any opportunity for realizing from the business a sinking fund, or other means with which to provide for payment of the principal of the bonds when these shall mature. The language of Justice Brewer, above quoted, is pertinent in this connection: "The idea of reasonableness is justice, and that which is unjust cannot be reasonable." Had plaintiff, in any manner, apparently sought to conceal any items pertaining to its business, which to defendant seemed material in this hearing, there might be some reason for doubting the correctness of the computations above made. But so far as seemed material to plaintiff, and so far as defendant asked, the entire business and accounts of plaintiff were opened up for investigation and consideration from its commencement of business, in 1876, to the date of the hearing. But we have not yet reached the final hearing in the case. What is now uncertain may, by the time of final hearing, become certain and convincing. Possibly, the result thus obtained may be contrary to present appearances. Opportunity, meanwhile, will probably be offered to definitely determine the working out of the ordinance in practice, in its business application. The test of experience—the most supreme test—may have been applied. As to the propriety of this test, Mr. Justice Woods, in the case of Tilley v. Railroad Co., 5 Fed. 662, when speaking of a hearing before him in an application for injunction against the enforcement of rates fixed by a railroad commission, says:

"The officers of the railroad company declare that the rates' fixed by the commission will so reduce its income that it will not suffice to pay the running

expenses of the road and the interest on the bonded debt, leaving nothing for dividends to its stockholders. The railroad commissioners assert that their schedule was framed to produce eight per cent. income on the value of the road, after paying cost of maintenance and running expenses. Which view is the correct one, it is impossible to decide from the evidence submitted. There is, however, a conclusive way—and it seems to me it is the only one—by which this controversy can be settled, and that is by experiment. A reduction of railroad charges is not always followed by a reduction of either gross or net income. It can soon be settled which is right—the railroad company's officers, or the railroad commission—in their view of the effect of the commission's tariff of rates, by allowing the tariff to go into operation."

This language is quoted by Judge Brewer (Railroad Co. v. Dey, 38 Fed. 664) on a hearing before him upon an application for a preliminary injunction in this state against a tariff of rates prescribed by the railroad commissioners of Iowa. Judge Brewer, after making the quotation, adds:

"While quoting this language as applicable hereto, I do not indorse it as of universal application, but only under the circumstances of the present case. Where the effect of the rates is doubtful, with a probability that they will prove compensatory, and the amount of business to be thereby affected is comparatively small, I think the courts may well wait for the test of experience. Influenced by these considerations, I am led to refuse the preliminary injunction, and to set aside the restraining order heretofore entered. It may well be that by the time this case comes to a final hearing the test of experience will have solved some of these matters, and it may be clear—as now seems probable —that the rates imposed by this last schedule are compensatory, within the rule laid down in the prior opinion, in which case an injunction ought not to issue, or clear that they are not compensatory, in which case, beyond any doubt, in my mind, a final and permanent injunction ought to be granted."

Is there, from the proof herein, such danger to plaintiff—such showing of irreparable injury to plaintiff—as to require that the preliminary writ shall issue? Taking the situation of plaintiff and defendant, where are the pressing, the controlling, equities? Plaintiff, at furthest, will receive within 40 cents per 1,000 feet of the prices heretofore received. According to the proof as now presented, plaintiff will pending this suit receive some profit. It is not compelled, as were plaintiffs in the Reagan and Ames Cases, to perform its business at ruinous or destructive rates, and without any compensation. The final hearing herein need not long be delayed, with a decision had on the merits, upon all the evidence that may be presented.

I have not attempted to notice herein all the points argued or pressed by counsel. Were I to attempt such presentation, this opinion, already too lengthy, would be greatly prolonged. I have given to the consideration of this application much time and study, through different methods of computation as to the items involved. About 10 days were occupied with the matter at the oral hearing in last August. The printed briefs of counsel were received after I had entered upon the fall sessions of this court, in September. These sessions continue, without interruption, until in December. I have devoted the past three weeks to the investigation of the proof and law presented, to the exclusion of other pressing official business. The nature of this case not only justified, but required, this exclusive and unremitting attention. The proof consists of

many hundreds of typewritten pages, with numerous tabular exhibits. The presentation by counsel of the facts and principles of law involved has been unusually thorough and complete, and consistent with the important financial and public interests involved, and as would have been confidently expected from the eminent legal standing and recognized ability of counsel representing the parties. If the court has erred in the conclusions reached, certainly such result cannot be charged to failure of counsel in presenting the case. I do not find in the proof presented and conclusions reached herein such showing as, when opposed to the prima facie proof of reasonableness of rates which accompanies and must be given to the ordinance, requires or justifies the issuing of a preliminary injunction. Accordingly the application for a preliminary injunction is denied, to which plaintiff excepts.